## GARDNER CHAPMAN *v.* TOWN OF ELLINGTON
### (11597)

DUPONT, C. J., FREEDMAN and SCHALLER, Js.

Argued September 30—decision released December 21, 1993

*Thomas P. Moriarty,* for the appellant (plaintiff).

*Susan Boyan,* with whom was *George Baker,* for the appellee (defendant).

SCHALLER, J. In these consolidated tax assessment appeals, the plaintiff property owner, Gardner Chapman, appeals from the judgment of the trial court rendered in favor of the defendant town of Ellington.[1] The principal issues on appeal are whether the trial court

---

[1] The plaintiff originally challenged the assessment of his property on the grand lists for 1986, 1987, 1988 and 1989, through two applications to the town's board of tax review. The plaintiff had first requested that the assessor and board of tax review correct the alleged clerical errors and authorize a tax refund for overpayment due to the alleged clerical errors.

improperly found (1) that the town assessor had not committed clerical errors in assessing the plaintiff's property pursuant to General Statutes (Rev. to 1989) § 12-60[2] and that the plaintiff was, therefore, not entitled to a refund pursuant to General Statutes (Rev. to 1989) § 12-129[3] for the years 1986, 1987, 1988 and 1989, and (2) that the assessor had not committed gross errors in valuing the property that resulted in the overvaluation[4] of the plaintiff's property and overpay-

The plaintiff next alleged that the tax assessor had made errors resulting in the overvaluation of his property. The Ellington board of tax review rejected the plaintiff's claims in both applications for review.

The plaintiff then took two appeals to the Superior Court. Since the two cases evolved from the same alleged errors in assessment, they were consolidated for the purposes of trial.

[2] At the time this case was brought, General Statutes (Rev. to 1989) § 12-60 provided in pertinent part: "Any clerical omission or mistake in the assessment of taxes may be at any time corrected . . . by the assessors or board of tax review . . . ." An amendment to this statute that did not become effective until October 1, 1990, included a statute of limitations period of "three years following the tax due date relative to which such omission or mistake occurred . . . ." Public Acts 1990, No. 90-101, § 1. Because the defendant did not claim that the statute of limitations barred the defendant from raising his claim of clerical error for any year, we do not consider the applicability of the new statute of limitations. See footnote 3.

[3] At the time this case was brought, General Statutes (Rev. to 1989) § 12-129 provided in pertinent part: "Any person . . . who, by reason of a clerical error on the part of the assessors . . . pays a tax in excess of that which should have been assessed against his property, or who is entitled to a refund because of the issuance of a certificate of correction, may make application in writing to the collector of taxes for the refund of such amount. Such application shall be made within six years from the date of payment and shall contain a recital of the facts and shall state the amount of the refund requested. . . ." An amendment to § 12-129 limiting the application period to three years became effective October 1, 1990. Public Acts 1990, No. 90-101, § 2. The defendant did not claim that the new statute of limitations barred the plaintiff from contesting the tax assessments made in any of the years on the ground that the assessor committed clerical errors. In fact, the defendant conceded at oral argument that it believed that the six year statute of limitations applied to this case. As a result, we will not address the impact, if any, of the new statute of limitations on this case.

[4] Valuation of the property in this case concerns two statutes. General Statutes § 12-63 provides: "The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant

ment of taxes for the years 1986, 1987, 1988 and 1989.[5] We affirm the judgment of the trial court.

The following facts are relevant to the resolution of this appeal. The plaintiff purchased land in Ellington in 1985 and began construction of the Johnny Appleseed Apartments. This apartment complex covered two parcels of land that ultimately contained a total of twelve residential apartment buildings (six buildings on each parcel) and one boiler and laundry building. Each apartment building had ten individual units. Two of the apartment buildings had full basements, one had a half basement and the others did not have basements.

The last revaluation of property relevant to the property involved in this appeal occurred in 1980. In 1986 and 1987, the then town tax assessor, William D. Marsele,[6] completed the initial assessments of the plaintiff's two parcels of property for the purposes of the grand lists.[7]

to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. *The present true and actual value of all other property shall be deemed by all assessors and boards of tax review to be the fair market value thereof and not its value at a forced or auction sale."* (Emphasis added.)

General Statutes § 12-63b sets forth the methods for gauging the fair market value of certain property that is used primarily for rental income. This statute is discussed in detail in footnote 12.

[5] With regard to this second claim, the town pleaded a special defense that the defendant was barred by the statute of limitations in General Statutes § 12-118 from pursuing the appeal for the years 1986, 1987 and 1988. The trial court did not rule on this defense. The plaintiff's appeal from the trial court's judgment on the first claim requires a review of the same set of facts and alleged errors for all four years. As a result of our determination that the trial court's judgment must be affirmed, we need not discuss further the viability of the town's special defense.

[6] Marsele was town tax assessor from 1978 to 1988.

[7] The apartment complex was constructed in two phases. Phase one (six apartment buildings) was completed in 1986. Phase two (six apartment buildings and the boiler-laundry building) was completed in 1987.

Marsele also completed assessment cards for the individual buildings located on each parcel during that time. On diagrams within the individual assessment cards, Marsele depicted that six of the buildings had basements, while in fact, only two had full basements and one a half basement. Each building card also contained a section entitled "building computations," in which the values of the different areas of the building were added to arrive at a total value. Marsele included the value of a basement on each of the cards, even on those cards representing buildings that did not have basements. Marsele testified that he had personally inspected each of the buildings, that he knew all of the buildings did not have basements, and that he included a basement value for each of the buildings "on purpose." According to the information on the cards, the total value for each building was then multiplied by a factor that took into account the location of the property, and that total was considered the "replacement cost new." Depreciation of 5 percent was then calculated, and 70 percent of that total was taken to arrive at the assessed value.

The plaintiff claimed at trial, on the basis of the information contained on the individual building assessment cards and the testimony of the plaintiff's expert witness, Wallace L. Inkpen, that Marsele had used a reproduction cost approach as the prime basis for the assessment. Inkpen, an experienced real estate appraiser, testified that many appraisers, in conducting reproduction cost analyses, use the Marshall Valuation Service as a guide for determining the cost to assign to each area of a building. He testified further that the value that Marsele had ascribed to the basements, $8.20 per square foot, was in the range for the cost given a basement by the 1980 Marshall Valuation Service. Inkpen then testified to his opinion that Marsele's figures represented "a basement cost for this type of structure during that period of time." As a result of his belief that a cost approach had been used

for the assessment, Inkpen also offered his opinion that the inclusion of the value of basements where none existed was a clerical error on the part of the tax assessor.[8] Inkpen testified that he believed that the town had overassessed the plaintiff, but he also testified that he had not conducted an appraisal of the property to determine independently its fair market value.[9] Inkpen was the only witness called by the plaintiff. On the basis of Inkpen's analysis regarding errors in assigning values for nonexistent basements, the plaintiff claimed that the total value of his two parcels of property was inflated, and that he had paid excessive taxes on the property.

Marsele testified that, in assessing the plaintiff's property to determine its fair market value, he did not rely solely on a cost approach. He testified that he also used an income approach.[10] He testified that he then

[8] On each assessment card, the value of the basement was listed as $41,980 (5120 square feet per basement multiplied by $8.20 per square foot).

[9] When called as a witness by the town, Inkpen engaged in the following colloquy with Susan Boyan, counsel for the town:

"[Boyan]: And you've conducted an appraisal on the Johnny Appleseed Apartments?

"[Inkpen]: No, I didn't conduct an appraisal.

* * *

"[Boyan]: And is it your testimony that you did not make any determination whether or not [the town's assessment was] the fair market value of the property as of 1980?

"[Inkpen]: No, I didn't.

* * *

"[Inkpen]: [My involvement in the matter] was limited to consulting. I informed the property owner that I had found what I perceived to be a clerical error on the basement . . . area, and that he was overassessed. And that was the extent of my consultation."

[10] Marsele also testified that the town would normally use a market approach, where sales of similar buildings would be compared to determine the fair market value of a particular building. He further testified that there were no comparable market sales of apartment complexes at the time of the 1980 revaluation, and, thus, this method could not be used to assess the plaintiff's property in 1986 and 1987. He did note that he is now able to verify his assessment by comparing his assessment figures to market

used the figure derived from that approach as a basis "to find out . . . matching up with a cost approach, whether we were in the ballpark or not."

In an effort to explain why each of the buildings, despite their structural differences, had the same assessed value listed on the individual assessment cards, the following colloquy between Susan Boyan, counsel for the town, and Marsele occurred:

"[Boyan]: And they're [each apartment building] all allocated the same amount whether they have a basement or not; is that correct?

"[Marsele]: That's right.

"[Boyan]: And can you explain how you arrived at those twelve cards?

"[Marsele]: What I did, and if you just don't look at the basement areas, but you look at all the areas on there as they're set up, when I set up his particular project here, you'll notice that all twelve buildings are essentially identical the way they're set up. The trend back—this is going back to 1985 and '86—was for apartment complexes to, once they were getting approval, there was a lot of [condominium] conversions at that point. What I tried to do with the tax records at that point and set up the cards this way was if there was that type of a conversion, it would be very easy for me to convert these to condominium values after the fact and establish values for closings. . . ."

Boyan later questioned Marsele regarding the impact of changing the individual assessment cards to reflect accurately the existence or nonexistence of a basement in a particular building. The following exchange occurred:

sales of apartment complexes occurring in 1985 and 1986. He further testified at trial that it was his opinion that the assessments did reflect fair market value of the plaintiff's two parcels.

"[Boyan]: If you went back and took off for those buildings, deducted those buildings that don't have basements, would it change . . . the appraised value on the ones that do have basements?

"[Marsele]: No. What would happen would be . . . if I went back and I changed the format of the way the cards are set up right now, essentially *the total value at the end would be essentially the same. It would just be a change in how the format of the card was set up.*" (Emphasis added.)

In its memorandum of decision, the trial court agreed with the plaintiff's position that if Marsele had relied on the reproduction cost method as set forth in the computation sections of the individual assessment cards to determine the value of the complex, the plaintiff's claim would be justified, as the additional amounts for the nonexistent basements would increase the assessed value. The court found, however, that the figures listed in the computation sections were not used to determine the value of the apartment complex. The court stated that "[o]nce [Marsele] obtained the fair market value for the land and buildings, in toto, he then divided that portion of the value of the property attributable to the residential buildings by twelve . . . . Thus, the figures denoted in these [computation] sections were not used to arrive at the assessed value of the complex but vice versa."

The court also stated that the plaintiff had the burden of proving that his property had been overvalued, and found that the plaintiff had not met that burden, by reason of the failure to produce any independent evidence of the fair market value of the property. The court further determined that, because the plaintiff had not established the fair market value of the property, the sole question that remained for the court was the credibility of Marsele's testimony. The court impliedly

deemed credible Marsele's testimony regarding the assessed value of the property, finding that Marsele had arrived at the value of the apartment complex in the manner that he had described.[11] As a result, the court found that there had been no clerical errors or overvaluation, and rendered judgment for the defendant.

The plaintiff argues on appeal that the trial court's findings of fact were clearly erroneous. Specifically, the plaintiff challenges the trial court's findings that the assessor did not make clerical errors in assessing the property by including basements on the assessment cards of buildings without basements, and that the assessor did not overvalue the property through errors in his assessment. We disagree.

The standard of review that we must apply to the trial court's findings of fact is the clearly erroneous standard. "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *Groton* v. *Yankee Gas Services Co.,* 224 Conn. 675, 691, 620 A.2d 771 (1993); *Crowell* v. *Danforth,* 222 Conn. 150, 156, 609 A.2d 654

---

[11] The court stated that "[i]f Marsele's testimony is to be believed, despite the curious procedure employed, no *clerical* error occurred and the assessment was not affected by the misinformation contained on the building cards." (Emphasis in original.) The court further described Marsele's procedure in assessing the property as "awkward," but nonetheless found his testimony credible. Although, after examining all the evidence, we affirm the judgment of the trial court, we do not condone Marsele's use of incorrect information regarding the basements on public documents.

(1992); see also *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 220, 435 A.2d 24 (1980)." (Internal quotation marks omitted.) *Pollio* v. *Conservation Commission,* 32 Conn. App. 109, 115, 628 A.2d 20 (1993).

I

We first address the trial court's finding that Marsele did not make clerical errors in assessing the property. In determining the value of property for tax purposes, the assessor must use the fair market value of the real property. General Statutes § 12-63.[12]

---

[12] See footnote 4. General Statutes § 12-63b further prescribes the method for obtaining the fair market value, as required by General Statutes § 12-63, of certain rental income real property as follows: "[W]ith respect to . . . property [where] there is insufficient data in such town based on current bona fide sales of comparable property which may be considered in determining such value, [the assessor] shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property. . . .

"(b) For purposes of subdivision (3) of subsection (a) of this section and, generally, in its use as a factor in any appraisal with respect to real property used primarily for the purpose of producing rental income, the term 'market rent' means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination."

The plaintiff raised, for the first time at oral argument, the issue that § 12-63b requires the assessor to consider all three methods of valuation in conducting the assessment. "[W]e do not review this claim raised for the first time on appeal. *Rydingsword* v. *Liberty Mutual Ins. Co.,* [224 Conn. 8, 9–10 n.1, 615 A.2d 1032 (1992)]; *Cahill* v. *Board of Education,* 187 Conn. 94, 99–100, 444 A.2d 907 (1982). 'Only in the most exceptional circumstances will this court consider a claim that was not raised in the trial court. . . . Such exceptional circumstances may occur where a new and unforeseen constitutional right has arisen between the time of trial and appeal or where the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial. . . . An exception may also be made where consideration of the question is in the interest of the public welfare or of justice between the parties.' (Citations omitted.) *Cahill* v. *Board of Education,* supra." *D'Addio* v. *Connecticut Ins. Guaranty Assn.,* 30 Conn.

The plaintiff contends that Marsele primarily used a cost approach as set forth in the building computation sections of the assessment cards, leading to the overassessment of the plaintiff's property. At trial, the plaintiff presented his expert, Inkpen, who testified that Marsele had used a cost approach as set forth in the computation sections of the assessment cards and made clerical errors in completing the assessment. Marsele testified, however, that he had used both an income and a cost approach,[13] and stated that the figures assigned to the basements on the building computation sections were included "on purpose."

"Clerical errors are of a character different from errors of substance, of judgment, or of law. *Reconstruction Finance Corporation* v. *Naugatuck,* 136 Conn. 29, 32, 68 A.2d 161 (1949). Where an error is of a deliberate nature such that the party making it at the time actually intended the result that occurred, it cannot be said to be clerical. See *Kuhlemeier* v. *County of Los Angeles,* 2 Cal. 2d 257, 261, 40 P.2d 828 (1935)." *National CSS, Inc.* v. *Stamford,* 195 Conn. 587, 596, 489 A.2d 1034 (1985). " '[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.' " *Newbury Commons Ltd. Partnership* v. *Stamford,* 226 Conn. 92, 99, 626 A.2d 1292 (1993), quoting *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 153, 527 A.2d 679 (1987). On appeal, this court will not retry the facts or pass on the credibility of witnesses. *Newbury Commons Ltd. Partnership* v. *Stamford,* supra, citing *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* 207 Conn. 468, 473, 542 A.2d 692 (1988).

App. 729, 736, 622 A.2d 609, cert. denied, 226 Conn. 903, 625 A.2d 1375 (1993). We conclude that none of these exceptions is applicable in this case and, accordingly, we will not review this claim.

[13] Marsele testified to having used a cost approach, but did not indicate that he had used the cost approach as set forth in the computation sections of the cards.

The trial court deemed credible the testimony of Marsele regarding his method of assessment and found that no clerical errors had been made. Since our review of the evidence indicates that the trial court's finding is supported, we conclude that the trial court was not clearly erroneous in finding that Marsele had not made clerical errors in the assessment.

## II

We next address the trial court's finding that the plaintiff's property had not been overvalued due to gross errors in the assessment. Under General Statutes § 12-60, the true and actual value of real property is considered to be the fair market value of the property. "The ultimate decision for the [trial] court is whether, considering all of the evidence . . . *the plaintiff has proved by a fair preponderance of the evidence that any of the assessments on its property were illegal or excessive.* Our Supreme Court has noted that this is a difficult burden. . . . [P]roper deference must be given to the judgment and experience of assessors. . . . In applying this principle, [t]he law contemplates that a wide discretion is to be accorded to assessors . . . . Only if the court finds that the property has been overvalued by the assessors, can it exercise its power to correct the valuation. . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Midway Green Corp.* v. *Board of Tax Review,* 8 Conn. App. 440, 442, 512 A.2d 984 (1986).

Although Inkpen testified that he believed the property was overassessed, he had not appraised the property to determine its fair market value. Inkpen was the only witness for the plaintiff. As a result, the trial court found that the plaintiff had not met its burden of proof that the property was overvalued, as the plaintiff presented no independent evidence of the fair market value of the two parcels of property. Upon review of the rec-

ord, we conclude that the evidence supports the trial court's determination, and that the finding that no overvaluation had occurred is not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.