[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This appeal from the Board of Tax Review first came to this court by appeal filed May 3, 1994 and returnable on the third Tuesday of May, 1994, wherein the plaintiffs appeal from the action and ruling of the Board of Tax Review of the Town of Bozrah and request that the valuation on the assessment date of October 1, 1993 as to the subject property be reduced to 70% of its true and actual value.
The defendant Town appeared by counsel on June 8, 1994. An answer to the complaint was filed on June 20, 1994.
The first amendment to the application to include a new assessment year was filed on November 14, 1994. An answer to the amended complaint was filed on November 18, 1994.
The case came to hearing on December 13, 1994 and continued on December 14, 1994 to a conclusion.
The court makes the following findings of fact.
Martin Rogan was formerly one of the individual owners of the subject premises known as 300-314 Fitchville Road, Bozrah, and is now the record owner as trustee of the Martin H. Rogan Trust.
The subject premises comprise a land area of 2.3 acres. The subject premises are situated in an R-2 multifamily residential zone. There are, presently situated on said premises, six CT Page 307 structures which include eleven rental units with a total of 22 bedrooms and 1 bath in each unit. The Town of Bozrah identifies the property as Map 7, Lot #1. The legal description is contained in a deed in Volume 26, page 15 of the Bozrah Land Records.
The subject premises are a legal preexisting nonconforming use. Current zoning calls for two acres or 80,000 square feet for a two-family dwelling.
The subject property has good access to roads and Route 2. The subject premises have been listed on the open market for some time past at an asking price of $450,000.00.
Thomas E. Sanders is a certified real estate appraiser and has 20 years of experience in his field. Sanders conducted an appraisal of the premises using the income method.
A public utility water main runs through t, h, e subject premises and the same is also subject to a drainage easement. Sanders is not a member of the American Institute of Appraisers. John Graham is the Chairman of the Board of Assessors of the Town of Bozrah and has served in the post for 23 years. One of Graham's duties as assessor is to correct errors in assessments when known or brought to his attention. Graham is familiar with the Rogan premises.
In 1992 the Town of Bozrah contracted with Real Estate Research Consultants of Danvers, Massachusetts to conduct its reassessment and revaluation of all of the property within its geographical confines.
Graham monitored Research Consultant's work. Research Consultants was in Bozrah for seven or eight months beginning in June, 1992. Graham certifies a grand list in Bozrah every year. If errors or omissions are detected, certificates of error are issued to affected parties. Real Estate Research Consultants used a market approach in their evaluation procedures. On lists prior to October 1, 1992, the Rogan land was always assessed as residential.
Graham considers, among other things, building permits, maps and subdivision plans in his duties as assessor.
Mr. Fishbone, a member of the Board of Assessors, brought the issue of proper assessment as to the Rogan property to Graham's CT Page 308 attention. Meetings are held at least once a month by the Assessors.
Robert J. Flanagan is a certified appraiser with an M.A.I. designation (Member Appraisal Institute). Flanagan has been an appraiser for 32 years and was formerly the Director of Real Estate for the City of New London for 29 years. Flanagan has a degree in Economics and has participated in various courses and seminars over the years. Flanagan has taught courses in real estate for 20 years and is the author of published works on real estate.
Flanagan appraised the subject premises in Bozrah. Flanagan collected a variety of data in performing his appraisal including the collection of relevant records, assessment records, planning and zoning records and sales information.
Bozrah is a rural community, not densely populated. Some farms, some commercial properties and mixed land uses.
The subject premises front on two streets and are generally level with a modest slope to Fitchville Pond. The property is bordered in part by a pond. The premises are basically rectangular in shape.
It is the position of the plaintiffs that the land that is the subject of the present tax appeal for list of October 1, 1993 and October 1, 1994 was land included within a revaluation performed by the Assessor of the Town of Bozrah effective October 1, 1992. The evidence in this case shows that the subject land, after an informal hearing process (wherein the plaintiffs appealed to the revaluation company) was valued as of October 1, 1992 in the amount of $20,830.00. For the assessment year October 1, 1993, the Assessor, after inquiry by Mr. Fishbone, determined that the figure utilized for the revaluation year for the subject land would not be acceptable for the years October 1, 1993, et seq. The Assessor, for reasons stated in his testimony, decided to revalue and/or change the assessment of the subject land to $73,500.00 based upon a fair market value of $105,000.00.
The issue presented here is whether a municipal assessor has the power under Connecticut General Statutes § 12-55 to increase a real property assessment subsequent to revaluation on the grounds that errors or mistakes had been made with respect to the assessment of real property. CT Page 309
Section 12-55 states, in pertinent part, that:
 [w]hen the lists of any town have been so received or made by the Assessor or Board of Assessors, they shall equalize the same, if necessary, and make any assessment omitted by mistake or required by law.
The assessor or board of assessors may increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list. . . . [Emphasis added.]
The court in 84 Century Limited Partnership v. Board of TaxReview of Rocky Hill, 207 Conn. 250, 262 (1988) addressed the issue presented herein, and concluded that a "[municipality has] the power under § 12-55 to adjust a real estate assessment in the interim years between decennial revaluations on the ground that a sale of the property in question showed that the property had greatly increased in value in relation to other properties in the town." Id. at 263. In the case at bar, this Court need not conclude that a municipal assessor's powers are as broad as those permitted in 84 Century Limited Partnership. 
The court in 84 Century Limited Partnership found that the powers conveyed by Section 12-55 are such that a municipal assessor can make the kind of corrections which were made by John Graham, Chairman of Bozrah's Board of Assessors, in the case at bar. The court stated that:
 Section 12-55 contains three operative phrases pertinent to our inquiry: (1) `When the lists of any town have been so received or made by the assessors, they shall equalize the same, if necessary;' (2) `make any assessment omitted by mistake or required by law;' and (`the assessors may increase or decrease the valuation of property as named in any such lists or in the last preceding grand list. . . .' (There follows the directions for notice to a taxpayer in the event of an increased assessment.) (Emphasis added.) There is no ambiguity in this broad grant of powers to assessors. It is a clear legislative mandate to grant to local assessors a continuing duty unrelated to decennial revaluation, to achieve administratively a fair and equal assessment for CT Page 310 all taxpayers. The power to equalize the lists, if necessary, imports a watchtower role for the assessor to correct inequalities, whether too high or too low. The `if necessary' language clearly comprehends interim changes in assessments for there is no such requirement in § 12-62 which mandates decennial revaluation. The latter have obviously been legislatively deemed necessary.
Like Mr. Rogan, the plaintiff in 84 Century LimitedPartnership claimed that § 12-55 only authorizes changes "omitted by mistake" or "required by law." However, the court in that case stated that:
 [s]uch a restrictive interpretation ignores the plain language of the statute. The fact that these two additional powers are specifically set out does not, in any way, limit the broad powers to equalize the assessments provided for earlier in the statute. The most logical interpretation of the effect of these two additional powers is that in addition to the power to equalize assessments the assessors are also empowered to make these specified changes. . . . Finally, the statute specifically gives to assessors the power to increase or decrease the value of assessed property. [S]tatutes should be construed so that no part of a legislative enactment is to be treated as insignificant and unnecessary and there is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment.
Id. B at 262-263.
Applying the aforesaid "three operative phrases" of Section12-55 to the case at bar, the Town: (1) equalized the tax lists so that plaintiff was assessed properly; (2) made a new prospective assessment because the appraisal company omitted the property information by virtue of a mistake,[1] and (3) increased the valuation of property which existed on the last preceding grand lists.
In short, Mr. Graham acted well within his enumerated powers conveyed by Section 12-55. As the court stated in 84 CenturyLimited Partnership, local tax assessors have a "continuing duty CT Page 311 unrelated to decennial revaluations, to achieve administratively a fair and equal assessment for all taxpayers." Id. at 262. The local tax assessor's "power to equalize lists, if necessary, imports a watchtower role for the assessor to correct inequalities, whether too high or too low" Id. The legislature, by using the words "if necessary," clearly comprehend[ed] interim changes in assessments. . . ." Id.
To hold otherwise would put an unfair tax burden on the other residents of Bozrah who are properly assessed. With respect to the plaintiff's property, the tax assessor exercised his power to equalize by correcting items which were "omitted by mistake." However, even assuming that these items were not omitted by mistake, the language of the statute uses the word "and" to separate the power to "equalize" and the power to "make any assessment omitted by mistake or required by law." These are separate powers. Therefore, the tax assessor exercised his "broad power to equalize assessments," which is a power explicitly authorized by the statute according to the court in 84 CenturyLimited Partnership. Id. at 262.
Any other holding would mean that municipalities and taxpayers must live with errors in assessments for 10 years. Equity and justice will not permit this. Section 12-55 requires that equity and justice be accomplished.
In addition to the power conferred by Section 12-55, the Town had the power to correct errors pursuant to Section 12-60 of the Connecticut General Statutes.
Section 12-60 provides, in pertinent part, that "[a]ny clerical omission or mistake in the assessment of taxes may be corrected according to the fact by the assessor or board of tax review. . . ." (Emphasis added.) Our courts have held that "[c]lerical errors are of a character different from errors of substance, of judgment or of law." National CSS, Inc. v.Stamford, 195 Conn. 587, 596 (1985); Reconstruction FinanceCorporation v. Borough of Naugatuck, 136 Conn. 29, 32 (1949);Chapman v. Ellington, 33 Conn. App. 270, 279 (1993). "Where an error is of a deliberate nature such that the party making it at the time actually intended the result that occurred, it cannot be said to be clerical." National CSS, Inc., supra,Chapman, supra.
Applying these principles to the case at bar, Robert J. CT Page 312 Flanagan testified that the errors which were made are factual errors. The statute provides that the assessment may be corrected "according to the fact." John Graham testified that the appraisal company made three errors which were adopted by the Town on October 1, 1992 grand list. These errors are factual and are contained in Defendant's Exhibit 5. The first error concerns the amount of acreage on the subject parcel. The appraisal company erroneously recorded "1" acre, instead of 2.3 acres, which is the amount of land contained within the subject parcel, as evidenced by the survey map marked as Defendant's Exhibit 8. The acreage listed below this involves the open space parcels which exist next to the subject parcel, but which are not subject to this lawsuit. These parcels are 2.1 acres and 2.2 acres respectively, for a total acreage of 4.3 acres. Therefore, Defendant's Exhibit 5 erroneously recorded 5.6 acres of open space, and erroneously recorded 1 acre as the acreage of subject building lot. These are factual error which were adopted on the October 1, 1992 grand list, but which were subsequently corrected by the Town.
With respect to the other two errors, these are also factual. Whether the land is being used as a residence or for commercial purposes is a question of fact. As the evidence demonstrated, this is income property containing 22 bedrooms and 11 1/2 bathrooms in 11 units. Moreover, whether the property is flat or so severely sloped as to affect the value of the land is a question of fact. The evidence, including Mr. Sanders' report at page 22, indicates that the property is generally level, with a slope commencing at the rear portion of the property.
In short, the Town changed Plaintiff's assessment "according to the fact[s]" as required by Section 12-60.
Additionally, the case law has defined clerical errors as errors of a character different from errors of substance, of judgment or of law. National CSS, Inc., supra; ReconstructionFinance Corporation, supra; Chapman, supra. The courts have also stated that clerical errors cannot be errors of a "deliberatenature such that the party . . . actually intended the result that occurred." (Emphasis added.) The evidence adduced at trial clearly shows that the Town did not deliberately intend to assess the wrong amount of acreage, or assess the property wrongly as residential, or assess the property wrongly as a severely sloped lot. Mr. Graham testified that he was not aware that the property was wrongly assessed until this was brought to his attention in 1993. Intent requires the knowledge to accomplish a result. cf CT Page 313 Black's Law Dictionary (6th ed. 1990). Since Mr. Graham had no knowledge that these errors were being committed he could not have deliberately intended them. These were not matters of judgment.
Therefore, the errors involved in this case are clerical errors which fall under the purview of Section 12-60, thereby empowering the Town to correct these errors.
Real property tax appeals are unlike negligence and contract cases where the court or jury must "pick a figure" which approximates the amount of a litigant's damages. Plaintiff must prove that the Town's valuation was excessive. which has been defined by our courts as "substantially overvalued." The courts which have confronted tax appeal cases have held that: (1) the plaintiff bears the burden of proving that the defendant's assessor's valuation is excessive (i.e., substantially overvalued),[2] (2) the plaintiff's burden is a "difficult one" because "proper deference" as well as "wide discretion" must be accorded to the assessor; (3) such deference is not a presumption in favor of the assessment; and (4) the court should ascertain the true and actual value of the plaintiff's property if the taxpayer has proven that the property was "substantially overvalued." Stamford Apartments Co. v. Stamford, 203 Conn. 586,589 (1987); Federated Department Stores, Inc. v. Board of TaxReview, 162 Conn. 77, 86-87 (1971); Jacobsen v. Board of TaxReview, 7 Conn. L. Rptr. 209 (September 7, 1992, Lewis, J.).
In Stamford Apartments Co., supra, the court stated:
 It is true when a property owner challenges the assessor's valuation, the plaintiffs' burden . . . is a difficult one. `[P]roper deference must be given to the judgment and experience of assessors.' [Citations omitted.] `The law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes.' [Citations omitted.] While we have recognized that proper deference should be accorded to the assessor's valuation, we have never characterized such deference as a presumption in CT Page 314 favor of the validity of the assessment. . . .
Id. at 256 [emphasis in original].
Applying these principles to the case at bar, the plaintiff has not proven that his property was "substantially overvalued" by the Town. Indeed, Mr. Sanders, plaintiff's appraiser, testified that if he valued this property as commercial, he believes the Town's value is correct, as he has seen nothing to contradict the Town valuation. Leaving this ; aside, however, the plaintiff's fail to meet their burden of proof for several reasons:
 (1) Plaintiff submitted two appraisal reports (Defendant's Exhibits 2 and 3) to the Board of Tax Review in March of 1994, and asked the Board to, in effect, believe these reports. However, in November of 1994, plaintiff submitted Mr. Sanders' report which concluded that the fair market value was approximately $20,000 less than the fair market value stated in Defendant's Exhibits 2 and 3. This is a substantial difference especially given the value of this land.
(2) Mr. Sanders' report has numerous deficiencies:
 (a) Mr. Flanagan testified that Mr. Sanders' report does not comply with the Uniform Standards of Professional Appraisal Practice (USPAP), in that it fails to provide rent schedules and computations which explain how he arrived at the figures he provided in his report. Mr. Flanagan testified that all appraisers licensed by State of Connecticut are bound by the USPAP.
 (b) Mr. Sanders used an income approach, but Mr. Flanagan testified that there were good comparable sales available. "The best test for the determination of value is that of market sales." Federated Department Stores, Inc., supra 87; Burritt Mutual Savings Bank v. New Britain, 146 Conn. 669, 675 (1959). Mr. Flanagan confirmed this widely held principle. This approach is preferred because it indicates the amount of money which willing buyers have paid, and which willing sellers CT Page 315 have accepted, in the free market. Id.[3] Contrary to plaintiff's assertations during final arguments, comparable sales must be "comparable" not identical. The issue is whether the town's assessment is in the ballpark or whether it is substantially overvalued. Reasonable minds can differ slightly with respect to the value of property. Indeed, Mr. Flanagan concluded that the fair market value of this property is $108,000, whereas the Town concluded it was $105,000. It is because reasonable minds can differ slightly that our courts have held that we must give "deference" and wide "discretion" to the tax assessor.
 (c) The highest and best use of this property is the use for which it presently is being used — an 11 unit apartment complex. This is a preexisting, nonconforming legal use. This property cannot be assessed in a vacuum, without regard for its use. Certainly a potential buyer would consider its use. No person could build buildings of the same density in Bozrah because of the Town;s zoning regulations. Mr. Flanagan testified that plaintiff's property is 5.5 times the allowed density. Thus, plaintiff has a monopoly which is sanctioned as a preexisting, nonconforming use. Moreover, if the buildings are destroyed, plaintiff may: (1) apply for a special use permit to rebuild the buildings under § 15.2.1 of the Town's zoning regulations or (2) the Town will automatically, pursuant to C.G.S. § 12-64a, reduce the assessment to reflect the changed use.[4]
 (d) Mr. Sanders' report states at page 37 that the fair market value of the land and buildings capitalized at 12.5%, for 1989, 1990 and 1991 was $106,472, $180,040 and $145,408 respectively. Mr. Flanagan testified that these figures do not make sense for several reasons. First, he questioned the manner in which they were arrived at since no calculations were provided. Second, Mr. Flanagan stated that Mr. Sanders deducted large expenses all in one year, whereas the expenses should have been averaged over several years. Third, the market did not fluctuate as much as these figures suggest. Fourth, plaintiff testified that his property is CT Page 316 being offered for sale at $450,000. Fifth, Mr. Flanagan believes that 12.5% is a high capitalization rate for a good quality property such as this, which is relatively low risk. Mr. Flanagan stated that 9-10% is a more appropriate capitalization rate, as this is a reasonable rate of return on this type of investment.
 (e) Mr. Sanders used a 7.5% management fee, whereas Mr. Flanagan testified that it is customary among appraisers to use a 5% management fee for this property which is of a good quality.
 (f) Mr. Sanders' report states at page 36 that a 30% contributory value of land to the overall value of the property is the "general value of thumb." However, Mr. Flanagan testified that there is no "general rule of thumb" because the contributing value depends on location (e.g., In the case of waterfront property, the land can be more valuable than the structures on it).
 (g) Mr. Sanders stated that he believes that plaintiff's 11 unit rental property is residential and not commercial. Moreover, he testified that a 50 story apartment building is residential and not commercial. These are income producing properties. These are businesses. These are commercial uses. Mr. Flanagan and Mr. Graham testified that assessors throughout Connecticut assess rental property with 4 or more apartments as commercial. A commercial use implies a use in connection with or for furtherance of a profit-making enterprise. Black's Law Dictionary, (6th ed. 1990).
Plaintiff has failed to prove that his assessment was "substantially overvalued." Plaintiff bears the burden of proving that the property was "substantially overvalued."
The Assessor of the Town of Bozrah valued the land which is the subject of this appeal on the list of October 1, 1993, et seq. at $105,000.00 with an assessment value of $73,500.00.
The valuation placed thereon by the assessor was its true and actual value on the assessment date. CT Page 317
The value placed thereon was not grossly excessive, disproportionate or unlawful.
Plaintiff's request for a reduction in his assessment is denied.
Austin, J.